**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

TIG INSURANCE COMPANY,

      Plaintiff,

      v.

TYCO INTERNATIONAL LTD.,
GRINNELL CORPORATION, and THE
BROOKLYN HOSPITAL CENTER, F/K/A
THE BROOKLYN HOSPITAL -
CALEDONIAN HOSPITAL,

      Defendants.

CIVIL ACTION NO. 3:08-CV-1584

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court are Defendant SimplexGrinnell LP's Motion for Summary Judgment (Doc. 115) and Plaintiff TIG Insurance Company's Motion for Summary Judgment on Exclusion 4 (Doc. 120), Motion for Summary Judgment on Exclusion 7 (Doc. 122), Motion for Partial Summary Judgment on Defendant's Affirmative Defense Asserting Estoppel (Doc. 124), and Motion to Strike the Affidavit of Lawrence A. Durkin and Testimony of Sean Patton (Doc. 174). For the reasons that follow, TIG's Motion to Strike will be granted in part and denied in part, TIG's Motion for Partial Summary Judgment on Grinnell's Affirmative Defense Asserting Estoppel will be granted, Grinnell's Motion for Summary Judgment will be denied, TIG's Motion for Summary Judgment on Exclusion 4 will be denied, and TIG's Motion for Summary Judgment on Exclusion 7 will be granted.

## BACKGROUND

### A. The Diversified Fire

Defendant SimplexGrinnell LP ("Grinnell") is and was at all relevant times a subsidiary of Tyco International Ltd. ("Tyco") that installs, manufactures, and supplies automatic fire sprinkler and fire alarm and detection systems. (Def.'s Stmt. of Material Facts ("SMF") at ¶¶ 1–2.) In 1995, Grinnell contracted to install fire protection sprinkler systems in a large document storage warehouse complex in West Pittston, Pennsylvania, owned by

Diversified Records Services, Inc. ("Diversified"). (Pl.'s SMF at ¶ 3.) By May 1997, the sprinkler systems were installed at Diversified's warehouse complex, but they were not turned on in one of the buildings because the accompanying alarm system had not yet been connected. (*Id.* at ¶ 4; Def.'s SMF at ¶ 4.)

A fire began at the Diversified complex on May 5, 1997 ("the Fire"). (Pl.'s SMF at ¶ 5; Def.'s SMF at ¶ 3.) That same day, Tyco reported the Fire to its third-party administrator, Crawford & Company ("Crawford"), who was responsible for investigating incidents that might give rise to claims under Tyco's liability insurance and appraising those potential claims. (Def.'s SMF at ¶¶ 5–6; Pl.'s SMF at ¶¶ 59–63.) Grinnell knew of the Fire the day that it began. (Pl.'s SMF at ¶ 8.) The Fire lasted several days, destroying three large warehouses and millions of corporate documents inside. (Def.'s SMF at ¶ 3; Pl.'s SMF at ¶¶ 6–7.) In a May 14, 1997 report to Grinnell's outside counsel, a Crawford adjuster stated that "[a] conservative estimate of damage" that the Fire caused to the Diversified warehouses and their contents was "about $8,000,000." (Def.'s SMF at ¶ 8; Pl.'s SMF at ¶¶ 67–68.) The adjuster did not alter his damage estimate between his initial report in May 1997 and his final report in December 1997. (Def.'s SMF at ¶ 10.)

## B. Grinnell's Insurance Coverage

Tyco and its subsidiaries had the following general liability program from July 1, 1996 to July 1, 1997: primary coverage of $5 million with National Union Fire Insurance Company of Pittsburgh, PA, an American Insurance Group ("AIG") member company; umbrella coverage with AIG of $15 million; first layer excess coverage with White Mountain Insurance Company ("White Mountain") of $40 million; and second layer excess coverage with American Excess Insurance Association ("AEIA") of $90 million (the "AEIA Policy"). (Pl.'s SMF at ¶ 9.)

The AEIA Policy, which occupied a "high excess layer," provided coverage of $90 million in excess of $60 million. (Def.'s SMF at ¶ 13.) The AEIA Policy had a retroactive date of July 1, 1993, meaning that it applied to occurrences beginning on or after that date.

(*Id.* at ¶ 14.)  It was a "reported occurrence policy," requiring that the occurrence happen during the policy period and notification of that occurrence likely to involve the policy be given to AEIA "as soon as practicable" during the policy period or within a sixty-day grace period following its expiration.[1]  (*Id.* at ¶¶ 15–16; Pl.'s SMF at ¶ 11.)  In September 1996, AEIA stopped writing new coverage.  (Def.'s SMF at ¶ 21.)  In March 1997, AEIA informed Tyco that the AEIA Policy would not be renewed after it expired on July 1, 1997 and requested that Tyco notify AEIA no later than that date of all known occurrences likely to involve the policy.  (*Id.* at ¶¶ 22–23.)

In May 1997, Tyco negotiated with insurers for its general liability program for the July 1, 1997 to July 1, 1998 policy period.  (Pl.'s SMF at ¶ 13.)  At that time, Tyco's insurance broker, J&H Marsh & McLennan, Inc. ("Marsh"), sought coverage from TIG Insurance Company ("TIG") for the 1997–98 policy year.  (*Id.* at ¶ 15; Def.'s SMF at ¶ 24.)  Grinnell asserts that Marsh contacted TIG to provide coverage for a portion of the expiring AEIA Policy layer and that TIG knew that it was being asked to provide protection against large, unanticipated "catastrophic" losses.  (Def.'s SMF at ¶¶ 24–25.)  Tyco believed that transitioning to the TIG coverage would leave a potential coverage gap for occurrences that happened during the AEIA Policy period (July 1, 1993 to July 1, 1997) but would not have been timely reported to AEIA because their existence or magnitude could not have been known at that time.  (*Id.* at ¶ 26.)  Tyco sought to extend the time for reporting such occurrences — those occurring prior to July 1, 1997 for which a claim is first made against Tyco after July 1, 1997.  (*Id.*; Pl.'s SMF at ¶ 16.)

TIG issued Policy No. XLX 914 12 65, an excess liability policy, for the period July

---

[1]    The AEIA policy provided general liability coverage for losses "result[ing] from an OCCURRENCE, notice of which shall have been first given to the COMPANY [AEIA] (in accordance with Condition (c) hereof) . . . by the NAMED INSURED [Tyco] during the POLICY PERIOD."  (Def.'s SMF at ¶ 16.)  Condition (c) required Tyco to notify AEIA of an occurrence "as soon as practicable" when "any employee of the risk management or legal department of any INSURED shall become aware of an OCCURRENCE likely to involve this POLICY."  (*Id.* at ¶ 17.)

3

1, 1997 to July 1, 1998, with limits of $30 million excess of $90 million (the "TIG Policy").
(Pl.'s SMF at ¶ 18; Def.'s SMF at ¶¶ 34–35.)  The TIG Policy provides coverage for losses
arising out of occurrences taking place during the policy period, but also includes an
"Extended Reporting Provision for Occurrences Prior to this Policy Period" endorsement
("Extended Reporting Provision" or "ERP").  (Pl.'s SMF at ¶¶ 19–20; Def.'s SMF at ¶ 28.)
The Extended Reporting Provision provides coverage for "claims[2] first made" after July 1,
1997 "resulting from occurrence(s) that took place during the period from 6/1/1993 to
7/1/1997" subject otherwise to the exclusions and conditions of the policy.  (Pl.'s SMF at ¶
21.)  The parties dispute whether the attachment point of the ERP is $60 million (the same
attachment point as the AEIA Policy) or $90 million (the same attachment point as the rest
of the TIG Policy).  (Doc. 117 at ¶ 37; Doc. 125 at 1.)

The TIG Policy's Extended Reporting Provision also contains seven exclusions, two
of which are relevant to this case.  Exclusion 7 excludes from coverage "[a]ny claims
resulting from an occurrence[3] of which the Named Insured had actual or constructive notice
prior to the commencement of coverage under this policy."  (*Id.* at ¶ 52; Def.'s SMF at ¶ 40.)
Exclusion 4 excludes coverage for "[a]ny claims covered, in whole or in part, by the terms
of any other policy of insurance available to the Named Insured, whether or not collectible."
(Pl.'s SMF at ¶ 69.)

Tyco's general liability program from July 1, 1997 to July 1, 1998 consisted of:
primary coverage with AIG of $5 million; umbrella coverage with AIG of $20 million; first
layer excess coverage with White Mountain of $65 million; second layer excess coverage

---

[2]     The Extended Reporting Provision defines a "claim" as a "written notice received
by the Named Insured [Tyco and its subsidiaries] of an intention to hold the
Named Insured responsible for any occurrence covered by this policy, and shall
include the service of suit or institution of arbitration proceedings against the
Named Insured."  (Def.'s SMF at ¶ 39.)

[3]     The TIG Policy incorporates the definition of "occurrence" used in the underlying
AIG umbrella policy, which defines "occurrence" as "an accident, including
continuous or repeated exposure to conditions, which results in Bodily Injury or
Property Damage neither expected nor anticipated from the standpoint of the
Insured."  (Pl.'s SMF at ¶¶ 54–56.)

with TIG of $30 million; third layer excess coverage with Zurich Insurance Company ("Zurich") of $40 million; and fourth layer excess coverage with Federal Insurance Company ("Chubb") of $40 million.  (*Id.* at ¶¶ 14, 19; Def.'s SMF ¶¶ 34–35, 37.)

**D. The Consolidated Action Suits**

In 1998 and 1999, various entities that stored documents with Diversified sued Diversified and Grinnell in the Court of Common Pleas of Luzerne County, Pennsylvania for losses associated with the Fire (the "Underlying Actions").  (*Id.* at ¶ 22; Def.'s SMF at ¶ 41.)  Diversified and its property insurer also sued Grinnell in the same court for damage to the warehouse complex and business interruption costs (the "Diversified Action").  (Pl.'s SMF at ¶ 23.)  The Underlying Actions and the Diversified Action were consolidated into a single action (the "Consolidated Action" and the "Consolidated Action Suits").  (*Id.* at ¶ 24.)

AIG controlled the defense and settlement of the Consolidated Action Suits.  (*Id.* at ¶ 29.)  A two-phase trial was held for the Consolidated Action, with the liability trial for two lead cases, brought by First Union Corporation ("First Union") and Mobil Oil Corporation ("Mobil"), beginning in September 2002.  (*Id.* at ¶ 30; Def.'s SMF at ¶¶ 42, 45.)  During the trial, Diversified and Grinnell entered into an agreement whereby Grinnell became responsible for all liability.  (Pl.'s SMF at ¶ 31.)  On October 18, 2002, the jury returned a liability verdict, assessing 60% fault to Diversified and 40% fault to Grinnell.  (*Id.* at ¶ 32; Def.'s SMF at ¶ 45.)   The jury awarded $20,534,963 in damages to First Union on December 13, 2002, and $20,750,653 to Mobil on January 17, 2003.  (Def.'s SMF at ¶ 46; Pl.'s SMF at ¶ ¶ 33–34.)  AIG appealed the judgments, but both were affirmed by the Superior Court of Pennsylvania on August 25, 2005.  (Def.'s SMF at ¶ 47; Pl.'s SMF at ¶ 36.)  AIG and White Mountain ultimately paid judgments of $32,979,909.57 to First Union and $31,631,905.00 to Mobil on August 15, 2006.  (Def.'s SMF at ¶ 48; Pl.'s SMF at ¶ 39.)

Approximately $67.4 million was paid in settling or resolving the Consolidated Action Suits.  (Pl.'s SMF at ¶ 46.)  Between 2003 and 2007, AIG and White Mountain resolved all the Consolidated Action Suits by settlement or payment of judgments within the $60 million limit of their policies.  (*Id.* at ¶ 37.)  In addition to the First Union and Mobil judgments, AIG

5

and White Mountain paid $1.675 million to Diversified to resolve its claims against Grinnell and $1.13 million to resolve the remaining Consolidated Action Suits. (*Id.* at ¶¶ 38–39; Def.'s SMF at ¶¶ 47–50.) Roughly $17.1 million of the $67.4 million was associated with costs paid by AIG in addition to the limits of its policies, equating to a $50.3 million erosion of the $60 million in coverage provided by AIG and White Mountain. (Pl.'s SMF at ¶ 40.) Following these insurer payments, the remaining amount left within the first $60 million in coverage for the 1996–97 insurance policies was approximately $9.7 million, which consisted of approximately $7.4 million under the first excess layer provided by AIG and $2.3 million under the second layer provided by White Mountain. (*Id.*)

**E. The Brooklyn Hospital Claim**

In 1999, the Brooklyn Hospital Center ("Brooklyn Hospital") sued Diversified in New York state court for damages resulting from the destruction of its documents in the Fire ("Brooklyn Hospital claim"). (*Id.* at ¶ 47.) Grinnell was added as a third-party defendant to the complaint in 2000. (*Id.*; Def.'s SMF at ¶ 43.) In 2002, the New York court allowed Brooklyn Hospital to amend its complaint to add Grinnell as a defendant and also granted Grinnell's motion to dismiss for *forum non conveniens*. (Pl.'s SMF at ¶¶ 27, 42; Def.'s SMF at ¶ 44.) The suit was transferred to the Court of Common Pleas of Luzerne County and docketed there in 2003, but was not joined in the Consolidated Action. (Pl.'s SMF at ¶ 42; Def.'s SMF at ¶ 44.) Following the resolution of the Consolidated Action Suits, the Brooklyn Hospital claim was the only remaining claim arising from the Fire. (Pl.'s SMF at ¶ 41.)

Pursuant to a stipulation that they entered into on October 4, 2002, Brooklyn Hospital and Grinnell agreed to accept the liability verdict in the First Union and Mobil trials. (*Id.* at ¶ 43; Def.'s SMF at ¶ 61.) The stipulation also provided that if Grinnell was found liable in those cases, it would accept complete responsibility for any damage verdict that rendered in favor of Brooklyn Hospital in a later proceeding. (Pl.'s SMF at ¶ 43.) On February 2, 2007, Brooklyn Hospital filed a subsequent complaint against Grinnell to recover damages it allegedly sustained due to the Fire. (*Id.* at ¶¶ 44–45; Def.'s SMF at ¶ 60.)

On August 14, 2007, TIG was notified of the Brooklyn Hospital claim. (Pl.'s SMF at

¶ 46; Def.'s SMF at ¶ 62.)  TIG asserts that this notice was the first time that it was made aware of the Brooklyn Hospital claim, (Pl.'s SMF at ¶ 46), while Grinnell argues that Marsh notified TIG about the Underlying Actions in October 2002 and January 2003 (Def.'s SMF at ¶ 54).  On September 26, 2007, Grinnell asked TIG to participate in resolving the Brooklyn Hospital claim.  (Def.'s SMF at ¶ 63; Pl.'s SMF at ¶ 46.)  On January 30, 2008, TIG reserved its rights regarding the claim.  (Def.'s SMF at ¶ 65; Pl.'s SMF at ¶ 46.)  Grinnell asserts that this was the first time that TIG indicated its intent to possibly challenge Tyco's coverage with respect to any claim arising out of the Fire.  (Def.'s SMF at ¶ 66.)  On March 28, 2008, TIG sent a supplemental reservation of rights letter, stating that it was reserving its rights based specifically on Exclusion 7 of the ERP.  (*Id.* at ¶ 67.)  On May 14, 2008, TIG commenced this declaratory judgment action seeking a determination of its rights or obligations owed under the TIG Policy.  (*Id.* at ¶ 68; Pl.'s SMF at ¶ 50.)

On October 1, 2008, the Brooklyn Hospital claim settled in principle for $20.5 million. (Def.'s SMF at ¶ 68; Pl.'s SMF at ¶ 47.)  AIG and White Mountain agreed to pay the first $9.1 million of the settlement, and Grinnell and TIG agreed to pay the remainder.  (Def.'s SMF at ¶ 70; Pl.'s SMF at ¶¶ 48–49 .)  Pursuant to their funding agreement, Grinnell paid $3,563,954.40 and TIG paid $7,840,699.69, with each party's payment being subject to the resolution of the coverage dispute in this action.  (Def.'s SMF at ¶ 70; Pl.'s SMF at ¶ 49.)

TIG seeks a judgment declaring that it has no duty to indemnify Grinnell for its loss in the Brooklyn Hospital claim and ordering Grinnell to reimburse TIG for its portion of the settlement payment, plus interest.  (Doc. 61 at 5–6.)  Grinnell raises counterclaims against TIG, seeking a declaratory judgment that its loss in the Brooklyn Hospital claim is covered under the TIG Policy and ordering reimbursement of its settlement payment, plus interest, pursuant to TIG's breach of contract.  (Doc. 62 at 8–9.)  On June 11, 2012, the parties filed cross-motions for summary judgment.  (Docs. 115, 120, 122, 124.)  TIG filed its Motion to Strike the Affidavit of Lawrence A. Durkin and Testimony of Sean Patton (Doc. 174) on August 3, 2012.  The Court held oral argument on these motions on October 24, 2012. These motions are ripe for the Court's review and will be considered below.

## ANALYSIS

### I. Motion to Strike

#### A. Legal Standard

It is well-established that evidence that would be inadmissible at trial is inadmissible when deciding a motion for summary judgment. *See Gonzalez v. Sec'y of Dep't of Homeland Security*, 678 F.3d 254, 262 (3d Cir. 2012). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The 2010 Amendments to Rule 56(c)(2) provide that there is no need to challenge the admissibility of summary judgment evidence by a separate motion to strike. Fed. R. Civ. P. 56(c)(2), 2010 amend. The party objecting to the evidence has the obligation to identify which statements should be struck as inadmissible. *See AT&T v. Shared Comm'ns Servs.,* No. 93–3492, 1995 WL 555868, at *3 (E.D. Pa. Sept. 13, 1995).

Federal Rule of Civil Procedure 56(c)(4) provides that an affidavit used to support or oppose a motion for summary judgment must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). "In some cases 'where the non-movant in a motion for summary judgment submits an affidavit which directly contradicts an earlier [Rule 30(b)(6)] deposition and the movant has relied upon and based its motion on the prior deposition, courts may disregard the later affidavit.'" *State Farm Mut. Auto. Ins. Co. v. New Horizont, Inc.*, 250 F.R.D. 203, 212–13 (E.D. Pa. 2008) (quoting *Hyde v. Stanley Tools*, 107 F. Supp. 2d 992, 993 (E.D. La. 2000); *see, e.g., Rainey v. Am. Forest & Paper Ass'n*, 26 F. Supp. 2d 82, 95 (D.D.C. 1998); *Ierardi v. Lorillard, Inc.*, No. 90-7049, 1991 WL 158911, at *3 (E.D. Pa. Aug. 13, 1991). "Yet, where the affidavit 'is accompanied by a reasonable explanation' of why it was not offered earlier, courts have 'allowed a contradictory or inconsistent affidavit to nonetheless be admitted' to supplement the . . . Rule 30(b)(6) testimony." *State Farm*, 250 F.R.D. at 213 (quoting

*Hyde*, 107 F. Supp. 2d at 993).

### B. TIG's Motion to Strike Affidavit of Lawrence Durkin and Testimony of Sean Patton (Doc. 174)

TIG moves to strike two pieces of evidence used to support Grinnell's Opposition to TIG's Motion for Partial Summary Judgment Dismissing Defendant's Affirmative Defense Asserting Estoppel (Doc. 161): the affidavit of Lawrence A. Durkin, counsel for the Brooklyn Hospital (the "Durkin Affidavit"), and certain deposition testimony of Sean Patton, Grinnell's Rule 30(b)(6) corporate representative (the "Patton testimony"). (Doc. 174.) TIG argues that the post-discovery Durkin Affidavit should be stricken, as it contradicts the Patton testimony and the admissible evidence in this case in an attempt to support a new or materially revised prejudice theory. (Doc. 174 at 2.) TIG also contends that a portion of the Patton testimony is inadmissible as hearsay because it is not based on Mr. Patton's personal knowledge. (*Id.* at 3.)

#### 1. Durkin Affidavit

In the Durkin Affidavit, dated July 13, 2012, Lawrence A. Durkin, Brooklyn Hospital's attorney of record in its suit against Grinnell and Diversified, affirms that before the Mobil and First Union verdicts in 2002, Brooklyn Hospital made a $500,000 settlement demand upon Grinnell that remained open until its complaint was filed in 2007. (Doc. 161, Ex. B at ¶¶ 4, 6–7.) Grinnell uses the Durkin Affidavit to support its "detrimental reliance" theory offered in opposition to TIG's motion for partial summary judgment on Grinnell's affirmative defense of estoppel. (Doc. 161 at 11.) Grinnell's reliance theory is as follows:

> As a result of TIG's delay in reserving rights and based upon Grinnell's experience with excess carriers, Grinnell lost the opportunity to settle the [Brooklyn Hospital claim] for $500,000, CSMF ¶ 146 (Kazanjian Opp'n Decl. Ex. 13 (Patton Dep. 116:10–15)) (testifying that a comprehensive settlement of all cases was not attempted because Grinnell "believed that all carriers were aligned about the defenses of the case" and that "TIG did not advise anybody that they weren't going to provide coverage"), which was withdrawn in 2007. Durkin Aff. ¶ 7.

(*Id.*)

TIG argues that the Durkin Affidavit is an attempt by Grinnell to materially alter its position held during discovery regarding the prejudice prong of its estoppel defense and must be stricken pursuant to Federal Rule of Civil Procedure 30(b)(6) for contradicting the Patton testimony. (Doc. 174 at 3–4; Doc. 177 at 3.) TIG contends that Grinnell's position during discovery was that it was prejudiced by TIG's delay in reserving rights because it lost the opportunity to ask its insurers to achieve a comprehensive settlement of all Fire-related claims within their $60 million coverage limits. (Doc. 177 at 3.) According to TIG, this position was first revealed in the following portions of the Patton testimony:

> Q: With respect to the estoppel affirmative defense, can you tell me what the basis [is] for Tyco's position that estoppel bars TIG from raising coverage defenses in this case?
>
> A: . . . [F]rom Tyco's perspective, Tyco was aware that the exposure could exceed the underlying layers of insurance coverage, at least as early as 2002 and prior to the trial and TIG's failure to advise as the other carriers, including [AEIA], had advised that there were any issues pertaining to coverage were very much to the detriment of Tyco and prejudiced Tyco's ability to assert to the excess carriers that they should make effort to resolve the claims within the available limits of coverage.
>
> \* \* \*
>
> Q: I want to focus now on the last part of your statement that related to the prejudice or detriment that Tyco suffered, allegedly suffered. I believe your testimony was that . . . the failure of TIG to provide advices on any coverage issues following receipt of the 2002 notice letter hindered Tyco's ability to tell the other excess carriers that they needed to try to resolve the underlying claims within their limits. Is that essentially your testimony?
>
> A: If you don't mind repeating the question, I want to make sure I'm following.
>
> (Record read.)
>
> A: Yes.
>
> Q: Is your testimony or position also that had Tyco raised this issue, that is, any coverage issues TIG may have had with the excess carriers that they would have had some ability to effect the amounts that were paid out in settlement?
>
> A: Tyco believes that if TIG had advised in a timely manner pursuant to their obligations as the insurer of Tyco and pursuant to fair claims

practices and best practices, that, yes, Tyco and the excess carriers . . . would have had to have considered a more comprehensive settlement and would have made more robust efforts to resolve within what would have been $60 million in available coverage.

\*     \*     \*

Q:     Did Tyco consider a comprehensive settlement, as you mentioned, at any time with respect to the underlying claims?

A:     To the best of my understanding, because there was only a half million dollars deductible that Tyco bore and because there was no indication by any of the excess carriers, that they would not participate and/or there were coverage issues, with the exception of [AEIA], it was Tyco's belief and reliance upon the fact that TIG did not advise anybody that they weren't going to provide coverage, so there was never an effort made for a comprehensive settlement because it believed that all the carriers were aligned about the defenses of the case.

Q:     Did any of the carriers, and, in particular, AIG and then National Union, suggest at any time that a comprehensive settlement of the underlying claims be considered?

A:     I don't have firsthand knowledge of the settlement discussions at that time.

\*     \*     \*

Q:     Do you have any – is there any indication in any documents or otherwise that suggests that AIG or National Union would have considered or did consider a comprehensive settlement of all the underlying claims?

A:     I'm not aware of any.

Q:     How about any of the other underlying insurers, that is, underlying TIG's policy, at any point in time, did any of them raise the prospect of a comprehensive settlement of the underlying claims?

A:     I'm not aware of that . . . .

(Doc. 177, Ex. A at 107:25–108:22, 113:5–114:16, 115:24–116:22, 117:7–19.)  When asked if, at any point in time, Brooklyn Hospital made a settlement demand, Mr. Patton testified that he did not know.  (Doc. 176, Ex. 2 at 58:20–25.)

TIG maintains that Grinnell's "new" position, that the prejudice suffered was the loss of the opportunity to settle the Brooklyn Hospital claim for $500,000, is supported only by the Durkin Affidavit.  (Doc. 177 at 4.)  In addition to citing Mr. Patton's lack of knowledge about any settlement demand made by Brooklyn Hospital, TIG notes that its

request for admission that Brooklyn Hospital was willing to settle its claim "for a couple hundred thousand dollars" in February 2003 by claiming that, after reasonable inquiries, Grinnell could neither admit nor deny the request based on the information it knew or could readily obtain. (*Id.* at 12.) TIG argues that the Durkin Affidavit should be excluded as irrelevant because there is no evidence that Grinnell was aware of the alleged opportunity to settle the Brooklyn Hospital claim for $500,000. (*Id.* at 13–14.) It also contends that the Durkin Affidavit should be stricken because it contradicts or materially alters the Patton testimony. (*Id.*)

Grinnell counters that the Durkin Affidavit is admissible and should not be stricken because it does not contradict or substantially alter the Patton testimony or other admissible evidence. (Doc. 175 at 6.) Grinnell emphasizes that Mr. Durkin is not a Grinnell employee and that his affidavit proffers facts based on his personal knowledge. (*Id.* at 8.) It argues that the Durkin Affidavit "is fully consistent with Grinnell's position that it detrimentally relied upon TIG's five-year silence as to its coverage position, allowing favorable settlement opportunities to pass in the belief that TIG was aligned with Grinnell's other carriers in providing coverage." (*Id.*) Grinnell also maintains that the Patton testimony cited by TIG as contradicting the Durkin Affidavit does not address the same issue as the affidavit because that testimony was limited to a four-month time period (October 2002 to February 2003) based on the questions asked. (*Id.* at 10.)

Grinnell's arguments regarding the Durkin Affidavit are without merit. A review of the deposition transcript shows that the testimony at issue was not limited to the time frame suggested by Grinnell.[4] The Patton testimony establishes that Grinnell did not

---

[4]     When asked if Brooklyn Hospital made a settlement demand *at any point in time*, Mr. Patton testified that he did not know. (Doc. 176, Ex. 2 at 58:20–25.) When asked if Tyco considered a comprehensive settlement of the underlying claims *at any time*, he testified that Tyco never tried to reach such a settlement because its excess carriers did not indicate that they had issues with coverage or would not participate. (Doc. 177, Ex. A at 115:24–116:15.) When asked if any of Tyco's carriers suggested *at any time* that a comprehensive settlement of the underlying claims be considered, he testified that he did not have firsthand knowledge of settlement discussions at that time. (*Id.* at 116:16–22.)

know if Brooklyn Hospital made a settlement demand at any time (Doc. 176, Ex. 2 at 58:20–25) and that Tyco believed that it was prejudiced by TIG's delay in reserving its rights because Tyco lost the opportunity to tell its excess carriers that they should try to resolve the underlying claims within their coverage limits (Doc. 177, Ex. A at 108:9–22, 113:9–23.)  The Durkin Affidavit is the only piece of evidence that supports Grinnell's position that its prejudice resulting from TIG's delay in reserving its rights was the lost opportunity to settle the Brooklyn Hospital claim for $500,000 – a position that is significantly different than that taken in the Patton testimony.  Because TIG has shown that the Durkin Affidavit contradicts and materially alters Grinnell's Rule 30(b)(6) testimony (i.e., the Patton testimony) and Grinnell has not explained why it was not offered earlier, TIG's Motion to Strike will be granted with respect to the Durkin Affidavit.

## 2. Patton Testimony

TIG moves to strike the following portion of the Patton testimony as inadmissible hearsay under Federal Rule of Evidence 602 on the grounds that it is not based on Mr. Patton's personal knowledge:

Q:  Did Tyco consider a comprehensive settlement, as you mentioned, at any time with respect to the underlying claims?

A:  To the best of my understanding, because there was only a half million dollars deductible that Tyco bore and because there was no indication by any of the excess carriers, that they would not participate and/or there were coverage issues, with the exception of [AEIA], it was Tyco's belief and reliance upon the fact that TIG did not advise anybody that they weren't going to provide coverage, so there was never an effort made for a comprehensive settlement because it believed that all the carriers were aligned about the defenses of the case.

(Doc. 174 at 3.)  TIG contends that because Mr. Patton did not start working at Grinnell until March 2004, he could not testify at trial as to Grinnell's beliefs from 2002 (when TIG allegedly first received notice) through January 2008 (when TIG first reserved its rights) regarding its insurers' alignment on coverage for the Fire-related claims as he did in the Rule 30(b)(6) deposition.  (Doc. 177 at 16.)  TIG also asserts that there is no additional foundation for the admissibility of the testimony.  (Doc. 174 at 8.)  TIG posits that Mr.

13

Patton could only testify at trial as to his personal belief from March 2004 through January 2008 that Grinnell's insurers agreed to provide coverage. (Doc. 177 at 16.) TIG argues that this portion of the Patton testimony is the only evidence proffered by Grinnell that supports its contention that all of its carriers were aligned about the defense of the Fire-related claims. (*Id.* at 14.)

Grinnell counters that the challenged Rule 30(b)(6) deposition testimony would be admissible at trial because Mr. Patton's employment in Tyco's Risk Management Department (2004–2008) overlaps with a majority of the relevant time frame relating to Grinnell's estoppel defense (2002–2008). (Doc. 175 at 13.)

Federal Rule of Civil Procedure Rule 30(b)(6) requires a corporation or other such entity to "designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf" where a party has named the entity in a subpoena and has set out "with reasonable particularity the matters for examination." Fed. R. Civ. P. 30(b)(6). In particular, "[t]he persons designated must testify about information known or reasonably available to the organization." *Id.* "[T]he testimony of the Rule 30(b)(6) designee is deemed to be the testimony of the corporation itself." *State Farm Mut. Auto. Ins. Co. v. New Horizont, Inc.*, 250 F.R.D. 203, 212 (E.D. Pa. 2008). Although a Rule 30(b)(6) deponent is not required to have personal knowledge of the noticed topics, they are obligated to prepare to speak on these topics. *In re Neurontin Antitrust Litig.,* MDL No. 1479, 2011 WL 2357793, at *5 (D.N.J. June 9, 2011). A corporate party has a duty to prepare its Rule 30(b)(6) deponent to "the extent matters are reasonably available, whether from documents, past employees, or other sources," *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.,* Civ. Act. No. 09–290, 2010 WL 4922701 at *3 (W.D.Pa. Nov.29, 2010) (citation omitted). "Even if the documents are voluminous and the review of the documents would be burdensome, the deponents are still required to review them in order to prepare themselves to be deposed." *In re Neurontin Antitrust Litig.*, 2011 WL 2357793, at *5 (quoting *Concerned Citizens v. Belle Haven Club,* 223 F.R.D. 39, 43 (D.Conn.2004)); *Harris v. New Jersey,* 259 F.R.D. 89, 92

14

(D.N.J.2007) ("The duty of preparation goes beyond matters personally known to the designee or to matters in which the designee was personally involved, and if necessary the deponent must use documents, past employees or other resources to obtain responsive information."). Although Rule 30(b)(6) allows a corporate designee to testify to matters within the corporation's knowledge during deposition, at trial the designee "may not testify to matters outside his own knowledge 'to the extent that information [is] hearsay not falling within one of the authorized exceptions.'" *Union Pump Co. v. Centrifugal Tech. Inc.*, 404 F. App'x 899, 907–08 (5th Cir. 2010) (quoting *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 435 (5th Cir. 2006)).

Given that Mr. Patton did not work for Tyco before March 2004, he would be unable to testify at trial as to Grinnell's beliefs regarding its insurers alignment on coverage for the Fire-related claims before that time. Other than the Patton testimony, Grinnell cites no admissible evidence that shows who at Grinnell relied upon TIG's silence and that a decision was made not to pursue a settlement (comprehensive or otherwise) based on that silence. Accordingly, TIG's Motion to Strike will be granted with respect to the challenged portion of the Patton testimony that discusses Grinnell's beliefs regarding its insurers alignment on coverage for the Fire-related claims before March 2004 and denied with respect to the remainder of the challenged portion.

## II. Motions for Summary Judgment

### A. Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the

outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* 2D Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2727 (2d ed.1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256–57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). And, "[t]o defeat summary judgment, [the non-moving party] 'cannot rest simply on the allegations in the pleadings,' but 'must rely on affidavits, depositions, answers to interrogatories, or admissions on file.'" *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 199 (3d Cir. 2001) (quoting

*Bhatla v. U.S. Capital Corp.*, 990 F.2d 780, 787 (3d Cir. 1993)); *see also Tilden Fin. Corp. v. Palo Tire Serv., Inc.*, 596 F.2d 604, 608 (3d Cir. 1979).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ.P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id.* (quoting *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### D. TIG's Motion for Partial Summary Judgment on Grinnell's Affirmative Defense Asserting Estoppel (Doc. 124)

Grinnell asserts that TIG should be estopped from raising its defenses to coverage for the Brooklyn Hospital claim because TIG did not reserve its rights prior to January 2008, more than five years after Grinnell gave TIG notice of the Consolidated Action Suits in October 2002 (Doc. 62 at ¶ 68; Doc. 161 at 2.) Grinnell contends that had it known earlier that TIG would raise coverage issues, it would have told its insurers responsible for the first $60 million in coverage to try to comprehensively resolve all Fire-related claims within their policy limits.[5] (Doc. 177, Ex. A at 108:9–22, 113:9–23.) It reasons that because it did not make this demand, it was exposed to uninsured loss arising out of the Brooklyn Hospital claim and thereby prejudiced. (Doc. 161 at 2–3.) Grinnell thus concludes that TIG should be estopped from raising defenses to coverage for the Brooklyn Hospital claim. TIG, however, argues that it is entitled to summary

---

[5]     Although Grinnell argues in its Brief in Opposition that its prejudice was losing the opportunity to settle the Brooklyn Hospital claim for $500,000 (Doc. 161 at 2), its prejudice theory is limited to its "original" position documented above because the Durkin Affidavit has been stricken.

judgment as to Grinnell's affirmative defense of estoppel because Grinnell fails to satisfy any requisite elements of the defense.  (Doc. 125 at 2–3.)

"Equitable estoppel is a doctrine of fundamental fairness intended to preclude a party from depriving another of a reasonable expectation, when the party inducing the expectation knew or should have known that the other would rely to his detriment upon that conduct." *Straup v. Times Herald,* 423 A.2d 713, 720 (Pa. Super. Ct. 1980).  To find an estoppel, "there must be such conduct on the part of the insurer as would, if the insurer were not estopped, operate as a fraud on some party who has taken or neglected to take some action to his own prejudice in reliance thereon." *Wasilko v. Home Mut. Cas. Co.*, 232 A.2d 60, 63 (Pa. Super. Ct. 1967).  To establish an affirmative defense based on estoppel, Grinnell must show:

> (1)    an inducement, whether by act, representation, or silence when one ought to speak, that causes one to believe the existence of certain facts;
>
> (2)    justifiable reliance on that inducement; and
>
> (3)    prejudice to the one who relies if the inducer is permitted to deny the existence of such facts.

*Chemical Bank v. Dippolito*, 897 F. Supp. 221, 224 (E.D. Pa. 1995) (citing *Zivari v. Willis*, 611 A.2d 293, 295 (Pa. Super. 1992)).  The party asserting estoppel must establish these elements by "clear, precise and unequivocal evidence." *Rock–Epstein v. Allstate Ins. Co.*, No. 07-2917, 2008 WL 4425059, at *4 (E.D. Pa. 1998).  However, to succeed on its summary judgment motion, TIG must establish that Grinnell cannot, as a matter of law, satisfy one of these three elements.

### 1.  Inducement

Grinnell argues that by failing to reserve rights before January 2008, TIG induced it to believe that TIG would cover the Fire-related claims after exhaustion of the first $60 million in coverage.  (Doc. 161 at 21.)  TIG counters that it did not induce Grinnell to believe that TIG would cover the Fire-related claims.  (Doc. 125 at 12.)  TIG argues that an excess insurer, such as itself, has no duty to defend its insured and thus cannot later

be estopped from raising coverage defenses if it fails to reserve its rights when notified of a claim or suit potentially implicating its coverage. (*Id.* at 13–14.) TIG reasons that because the TIG Policy contains no duty to defend, TIG had no obligation to speak at any time before reserving its rights in January 2008. (*Id.* at 15.) TIG concludes that, absent such a duty, there can be no inducement, and therefore no estoppel. (*Id.*)

In response, Grinnell argues that TIG's claim regarding an excess carrier's duty to defend – that an excess carrier with no "duty to defend" provision in its policy has no legally-imposed duty to defend or to speak – is not found in Pennsylvania law. (Doc. 161 at 18.) It also notes that no court applying Pennsylvania law has adopted that an excess carrier only has a duty to reserve its rights when it has a duty to defend. (*Id.* at 19.) Grinnell argues that based on its past experiences with excess carriers, as well as TIG's course of conduct (*i.e.*, issuing a reservation of rights letter as soon as it had reason to know of potential coverage issues), it was induced to believe that TIG would provide coverage. (*Id.* at 21.) Grinnell further maintains that there is a genuine issue of material fact as to whether TIG had a duty to inform Grinnell of its coverage position between 2002 and 2007, when Grinnell could have settled the Brooklyn Hospital claim for a far lower sum. (*Id.* at 20–21.)

To constitute an inducement, one must "commit an act or forbearance that causes a change in condition resulting in disadvantage to the one induced." *Chemical Bank v. Dippolito*, 897 F. Supp. 221 at 224 (E.D. Pa. 1995) (citing *Novelty Knitting Mills, Inc. v. Siskind*, 500 Pa. 432, 457 A.2d 502, 503 (1983)). An inducement by silence cannot be established unless there is a duty to speak. *Id.* Given that the Supreme Court of Pennsylvania has not spoken on whether an excess carrier with no duty to defend has a duty to reserve rights, it is the Court's task to predict how that court would rule on it. *Lauchle v. Keeton Grp., LLC*, 768 F. Supp. 2d 757, 761 (M.D. Pa. 2011) (citing *U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.*, 80 F.3d 90, 93 (3d Cir. 1996). While undertaking this task, the Court must "consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data

19

tending convincingly to show how the highest court in the state would decide the issue at hand." *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 663 (3d Cir. 1980).

As neither the Court nor the parties have found any relevant Pennsylvania case law to guide this exercise, the Court is left to rely upon case law from other jurisdictions and scholarly works. The Court finds the following discussion from the Illinois Appellate Court to be particularly instructive:

> It is the duty to defend that gives rise to the duty to reserve rights when defense of a claim is undertaken, and without such a duty an insurer has no obligation to issue a reservation of rights letter. An excess insurer that has no duty to investigate coverage issues or to defend its insured will not be estopped from later asserting coverage defenses by a failure to issue a reservation of rights letter. However, if it is the custom to issue a reservation of rights letter between an insurer and its insured, this custom could give rise to an estoppel if it is detrimentally relied upon by the insured.

*Montgomery Ward & Co., Inc. v. Home Ins. Co.*, 753 N.E.2d 999, 1006 (Ill. App. Ct. 2001) (internal citations omitted). The rule that excess insurers, who have no duty to defend, are under no obligation to reserve their rights is also echoed in the *Appleman on Insurance Law* treatise:

> Because an excess insurer has no duty to defend its insured, it cannot later be estopped from raising coverage defenses, or be said to have waived those defenses, if it fails to reserve its rights when notified of a claim or suit potentially implicating its coverage.[6] It is, after all, an insurer's duty to defend which compels it to reserve its rights, and without a duty to defend an excess insurer has no obligation to issue a reservation of rights letter.[7]

Douglas R. Richmond, *New Appleman on Insurance Law Library Edition*, § 24.04 (2011). The Court finds this rule to be well-reasoned and predicts that the Pennsylvania Supreme Court would adopt it.

---

[6] Citing *Interstate Fire & Cas. Co. v. Archdiocese of Portland*, 899 F. Supp. 498, 501 (D. Or. 1995), *aff'd* ,139 F.3d 1234 (9th Cir. 1998); *Phila. Indem. Ins. Co. v. Barerra*, 998 P.2d 1064, 1069 (Ariz. Ct. App. 1999), *vacated on other grounds*, *Phila. Indemn. Ins. Co. v. Barrera*, 21 P.3d 395, 398 (Ariz. 2001); *State Farm Fire & Cas. Co. v. Jioras*, 29 Cal. Rptr. 2d 840, 844 (Cal. Ct. App. 1994); *Montgomery Ward & Co. v. Home Ins. Co.*, 753 N.E.2d 999, 1006 (Ill. App. Ct. 2001); *Int'l Ins. Co. v. Sargent & Lundy*, 609 N.E.2d 842, 855 (Ill. App. Ct. 1993).

[7] Citing *Int'l Ins. Co. v. Sargent & Lundy*, 609 N.E.2d 842, 855 (Ill. App. Ct. 1993).

Under Pennsylvania law, "an insurer's duty to defend is purely contractual, and an insurer has no duty to defend unless the obligation is expressed in the policy." *Genaeya Corp. v. Harco Nat. Ins. Co.*, 991 A.2d 342, 347 (Pa. Super. Ct. 2010); *see also AstenJohnson, Inc. v. Columbia Cas. Co.*, 562 F.3d 213, 230 (3d Cir. 2009). It is undisputed that Section I.C.1 of the TIG Policy[8] clearly establishes that TIG has no duty to defend Grinnell. (Doc. 125 at 20; Doc. 161 at 20.) Because TIG, an excess insurer, has no contractual duty to defend Grinnell, its insured, it is under no obligation to issue a reservation of rights letter to Grinnell and "will not be estopped from later asserting coverage defenses" for failing to do so. *Montgomery Ward & Co.*, 753 N.E.2d at 1006. Therefore, Grinnell cannot, as a matter of law, show that TIG's failure to issue a reservation of rights letter under 2008 induced Grinnell to believe that it would provide coverage for the Fire-related claims.[9]

### 2. Justifiable Reliance

Assuming, *arguendo*, that Grinnell could establish the inducement prong of its estoppel defense, the Court will address the justifiable reliance prong of the defense.

TIG next argues that there was no reliance by Grinnell, and even if there had been, it was not justifiable. (Doc. 125 at 24.) TIG claims that Grinnell did not rely on

---

[8]    "WE shall not be called upon to assume charge of the investigation, settlement or defense of any claim made or suit brought against YOU, but WE shall have the right and be given the opportunity to be associated in the defense and trial of any claims or suits relative to any occurrence which, in OUR opinion, may create liability on the part of US under the terms of this policy." (Pl.'s SMF at ¶ 85.)

[9]    Grinnell's contention that its past experiences with excess carriers and knowledge of TIG's practices and policies, as listed TIG's claims handling manual, induced it to believe that TIG would provide coverage is of no moment. There is no evidence that TIG ever sent a reservation of rights letter to Ginnell in the past, and evidence of TIG's general practices does not create a duty for TIG to reserve rights. *See Int'l Ins. Co. v. Sargent & Lundy*, 609 N.E.2d 842, 855 (Ill. App. Ct. 1993) ("[The insured] alleges . . . that [the insurer] "as a matter of practice" issued reservation of rights letters. While it may be true that such a course of conduct between an insurer and its insured could give rise to an estoppel if detrimentally relied upon by the insured, no allegations have been made of such a course of conduct between the parties here. Only [the insurer's] general practice is referred to.")

TIG's silence to form the belief that the TIG Policy or the ERP covered the Fire-related claims, a belief that Grinnell did not hold until after June 2007.  (*Id.*)  In support of this position, TIG points to correspondence from 1999 through 2007 that identifies AEIA, White Mountain, and Zurich as potential providers of the coverage layer in excess of $60 million.  (*Id.* at 24–26.)  TIG argues that no estoppel could be established based on events before 2007, as Grinnell believed at that time that other insurers provided the relevant coverage.  (*Id.* at 26.)

TIG also contends that Grinnell could not have reasonably relied on TIG's silence because where an insurer on notice of an occurrence or claim has not yet provided benefits or issued a reservation of rights letter, it is unreasonable for the insured to believe that the insurer has no issues with coverage.  (*Id.* at 26–27) (citing Allen D. Windt, *Insurance Claims and Disputes*, § 2.20 at 72–74 (3d ed. 1995)).  TIG claims that Grinnell did not ask TIG to do anything regarding the Fire-related claims until September 26, 2007, when it requested TIG to participate with respect to the Brooklyn Hospital claim.  (Doc. 125 at 27.)  TIG therefore reasons that because it was not providing benefits under the TIG Policy prior to its reservation of rights in January 2008, Grinnell's reliance on TIG's silence was unreasonable and unjustified.  (*Id.* at 28.)

In response, Grinnell argues that a genuine dispute of material fact remains as to whether it detrimentally relied upon TIG's silence and was prejudiced by doing so.  (Doc. 161 at 21.)  It argues that whether TIG's five-year delay in reserving its rights (based on Grinnell's assertion that it put TIG on notice of the Consolidated Action in October 2002) was reasonable also raises factual issues.  (*Id.* at 23.)  It also contends that questions of fact remain as to whether TIG's delay in responding was reasonable and whether that delay led Grinnell to reasonably rely on TIG's silence as grounds for believing that TIG would provide coverage for the Brooklyn Hospital claim.  (*Id.* at 25.)

When viewing the evidence in the light most favorable to Grinnell, a genuine dispute of material fact exists as to whether Grinnell relied upon TIG's silence and, if so, whether that reliance was reasonable.  The evidence cited by TIG, which shows that

from 1999 through 2007 Grinnell identified AEIA, White Mountain, and Zurich as potential carriers of the coverage layer in excess of $60 million (Doc. 125 at 24–26), supports TIG's contention that Grinnell did not rely upon TIG's silence.  However, Grinnell points to evidence that it informed TIG of the Consolidated Action in October 2002 and January 2003 (Defs.' SMF at ¶¶ 54–55) and that it relied upon TIG's silence, at least from March 2004 onward (Doc. 177, Ex. A at 116:3–15).  Accordingly, TIG is unable to show that no genuine dispute of material fact exists with regard to the question of justifiable reliance.

### 3. Prejudice

TIG claims that Grinnell cannot establish prejudice because, by Grinnell's own admission through the Patton testimony, it is purely speculative whether an earlier reservation of rights by TIG would have resulted in a more favorable and comprehensive resolution of the Fire-related claims.  (Doc. 125 at 29.)  To bolster its claim that Grinnell's argument is speculative, TIG points to Grinnell's agreement with AIG's handling of the defense and settlement of the Consolidated Action Suits.  (*Id.* at 30.)  TIG further notes that even after Grinnell learned in September 2002 that Zurich (the "retro coverage" insurer above $60 million) reserved rights as to claims in this matter, Grinnell continued to defer to AIG instead of demanding a global settlement of all Fire-related claims within the available $60 million in coverage.  (*Id.* at 31.)  TIG posits that even if Grinnell would have demanded a global settlement of all Fire-related claims after initially informing TIG of the Fire on February 3, 2003, it is speculative whether that demand would have resulted in AIG altering its strategies regarding those claims.  (*Id.* at 31–32.)

Grinnell counters that its evidence of prejudice is not speculative, but rather raises genuine factual disputes.  (Doc. 161 at 26.)  Grinnell points to evidence that it believed all of its insurers were aligned on the defense of the Fire-related claims and would be providing coverage for them.  (*Id.* at 27.)  Grinnell argues that the evidence raises factual issues as to whether Grinnell was prejudiced by foregoing the opportunity to request a its insurers to resolve all Fire-related claims within their policy limits because it believed it

had a solid line of insurance coverage. (*Id.*)

"[P]rejudice may not be presumed, it must be conclusively established in order to effect an estoppel." *Merchants Mut. Ins. Co. v. Artis*, 907 F. Supp. 886, 892 (E.D. Pa. 1995). Here, Grinnell cannot point to any evidence that it would have acted on the opportunity to request a comprehensive resolution of the Fire-related claims, that such a request would have resulted in AIG changing its strategies to resolve the claims, or that such a change in strategy would have been successful. Therefore, assuming *arguendo* that there was inducement, Grinnell cannot, as a matter of law, show that its reliance on TIG's inducement resulted in prejudice to it.

Because TIG has shown that Grinnell cannot prove the first or third prongs of its estoppel defense, TIG's Motion for Partial Summary Judgment will be granted.

### C. Grinnell's Motion for Summary Judgment (Doc. 116)

Grinnell moves for summary judgment on the grounds that it is entitled to coverage under the TIG Policy because its loss in the Brooklyn Hospital claim is covered by the TIG Policy's Extended Reporting Provision and not barred by any exclusions listed in the ERP. It specifically argues that Exclusion 7 of the ERP is latently ambiguous and therefore must be construed in Grinnell's favor. It also contends that even if Exclusion 7 was not susceptible to Grinnell's interpretation, TIG's interpretation must be rejected because it would render the coverage provided by the ERP illusory.

### 1. Coverage by the ERP

Grinnell argues that its loss in the Brooklyn Hospital claim falls within the coverage provided by the ERP, which makes the TIG Policy applicable to claims first made against Grinnell after July 1, 1997 resulting from occurrences that took place from June 1, 1993 to July 1, 1997. (Doc. 116 at 19.) Grinnell contends that it is beyond dispute that, under the TIG Policy, Grinnell is a "named insured," the Fire qualifies as an "occurrence" that took place between June 1, 1993 and July 1, 1997, and the Brooklyn Hospital Claim was a "claim" that was filed after July 1, 1997. (*Id.*)

The interpretation of an insurance contract is a question of law for the court to

decide. *Reliance Ins. Co. v. Moessner,* 121 F.3d 895, 900 (3d Cir.1997) (citing *Standard Venetian Blind v. Am. Empire Ins. Co.,* 503 Pa. 300, 469 A.2d 563, 566 (Pa.1983)). A court must give effect to the plain language of the insurance contract read in its entirety. *Reliance Ins. Co.,* 121 F.3d at 901. The insured has the initial burden of establishing coverage under the policy. *Butterfield v. Giuntoli,* 448 Pa. Super. 1, 670 A.2d 646, 651–52 (1995). On the other hand, when the insurer relies on a policy exclusion as the basis for denying coverage, it bears the burden of proving that the exclusion applies. *Mistick, Inc. v. Northwestern Nat. Cas. Co.,* 806 A.2d 39, 42 (Pa. Super. 2002). Policy exclusions are strictly construed against the insurer. *Seiko v. Home Ins. Co.,* 139 F.3d 146, 152 n. 3 (3d Cir.1998) (citing *Standard Venetian Blind,* 469 A.2d at 566).

Here, TIG does not dispute that Grinnell is a "named insured" or that the Fire qualifies as an "occurrence" under the TIG Policy. (Doc. 118, Ex. 35 at 2.) The ERP defines a "claim" as "written notice received by the Named Insured of an intention to hold the Named Insured responsible for any occurrence covered by this policy . . . includ[ing] the service of suit . . . against the Named Insured." (Doc. 118, Ex. 33 at ¶ F(1)). Under this definition, the Brooklyn Hospital claim is a "claim" under the TIG Policy's ERP. Finally, as the Brooklyn Hospital claim was filed in 1999 (Pl.'s SMF at ¶ 47), it cannot be disputed that the claim was filed after July 1, 1997. Accordingly, coverage under the TIG Policy is available for the loss incurred by Grinnell in the Brooklyn Hospital claim, provided that none of the ERP's exclusions apply.

### 2. Latent Ambiguity

Grinnell claims that Exclusion 7 of the ERP, which bars coverage for "[a]ny claims resulting from an occurrence of which the Named Insured had actual or constructive notice prior to the commencement of coverage under this policy," does not apply to the Brooklyn Hospital claim because it contains a latent ambiguity and therefore must be construed against TIG. (Doc. 116 at 20.) It argues that TIG's reading of Exclusion 7, which would exclude claims resulting from all occurrences that Grinnell knew about at the inception of the TIG Policy, ignores a reasonable alternative interpretation that is

supported by extrinsic evidence and better reflects the parties' intent. (*Id.*) It contends that its interpretation – that Exclusion 7 only excludes claims resulting from occurrences that, at the inception of the TIG Policy, Grinnell knew or reasonably should have known were likely to trigger TIG's excess layer of coverage – is reasonable because extrinsic evidence shows that the ERP was intended to ensure that there would be no gap in coverage between the AEIA Policy and the TIG Policy (*i.e.*, to extend the period for reporting occurrences that took place during the period covered by the AEIA Policy). (*Id.* at 20–22.)

TIG counters that Grinnell's loss from the Brooklyn Hospital Claim is barred from coverage under Exclusion 7 because the exclusion is unambiguous and Grinnell was aware of the Fire before the TIG Policy started on July 1, 1997. (Doc. 164 at 14.) TIG argues that Exclusion 7 should be enforced as written because Grinnell's extrinsic evidence only addresses the parties' alleged expectations surrounding the ERP and does not reveal a latent ambiguity in a facially unambiguous term in the TIG Policy. (*Id.* at 19–20.) It also notes that Grinnell's extrinsic evidence does not establish the intent behind the ERP that Grinnell suggests. (*Id.* at 21–23.)

"Pennsylvania contract law begins with the 'firmly settled' point that 'the intent of the parties to a written contract is contained in the writing itself.'" *Bohler–Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 92 (3d Cir. 2001) (quoting *Krizovensky v. Krizovensky*, 425 Pa. Super. 204, 624 A.2d 638, 642 (1993)). If a written contract's terms are clear and unambiguous, construction of the contract is a question of law for the court. *Bohler–Uddeholm*, 247 F.3d at 92–93. If the contract is unambiguous, "parol evidence of prior inconsistent terms or negotiations is inadmissible to demonstrate intent of the parties." *Beta Spawn, Inc. v. FFE Transp. Servs., Inc.*, 250 F.3d 217, 227 (3d Cir. 2001) (citing *Gianni v. Russell & Co., Inc.*, 281 Pa. 320, 126 A. 791, 792 (1924)). When the terms of an insurance policy are clear and unambiguous, "the general rule in Pennsylvania is to give effect to the plain language of the agreement." *Reliance Ins. Co.*, 121 F.3d at 901. "Where a contract provision is ambiguous, however, extrinsic

evidence may be properly admitted in an attempt to resolve the ambiguity." *Beta Spawn, Inc.*, 250 F.3d at 227 (citing *In re Herr's Estate*, 400 Pa. 80, 161 A.2d 32, 34 (1960)).  Contract language is ambiguous if it is reasonably susceptible to more than one construction and meaning. *Bowersox v. Progressive Cas. Ins. Co.,* 781 A.2d 1236, 1239 (Pa. Super. 2001) (citing *Hutchinson v. Sunbeam Coal Corp.,* 513 Pa. 192, 519 A.2d 385, 390 (1985)). However, the language of an insurance policy may not be stretched beyond its plain meaning to create an ambiguity. *Madison Constr. Co. v. Harleysville Mut. Ins. Co.,* 557 Pa. 595, 735 A.2d 100, 106 (1999).  When the language of an insurance policy is ambiguous, it is well-settled that the provision be construed against the insurer. *Reliance Ins. Co.,* 121 F.3d at 900–01 (citing *Standard Venetian Blind Co.,* 469 A.2d at 566).

Pennsylvania recognizes two kinds of ambiguity: patent and latent.  A patent ambiguity "'appears on the face of the instrument, and arises from the defective, obscure or insensible language used.'" *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir. 1994) (quoting *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 663 (1982)).  A latent ambiguity, by contrast, "'arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language used thereof, on its face, appears clear and unambiguous.'" *Allegheny Int'l, Inc.*, 40 F.3d at 1424 (quoting *Steuart*, 444 A.2d at 663).

"To determine whether an ambiguity exists in a contract, the court may consider 'the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.'" *Bohler–Uddeholm*, 247 F.3d at 93 (quoting *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980)).  When a court examines a contract containing facially clear language, Pennsylvania law requires that the court interpret the language without using extrinsic evidence and also examine extrinsic evidence to determine whether there is a latent ambiguity.  *Bohler–Uddeholm*, 247 F.3d at 94.

The Third Circuit has made it clear that district courts may only consider certain

kids of extrinsic evidence to establish latent ambiguity in a contract: "A party may use extrinsic evidence to support its claim of latent ambiguity, but this evidence must show that some specific term or terms in the contract are ambiguous; it cannot simply show that the parties intended something different that was not incorporated into the contract." *Bohler–Uddeholm*, 247 F.3d at 93. "[T]he parties' expectations, standing alone, are irrelevant without any contractual hook on which to pin them." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 n.9 (3d Cir. 1995). The key inquiry is whether "the proffered extrinsic evidence is about the parties' objectively manifested 'linguistic reference' regarding the terms of the contract, or is instead merely about their expectations. The former is the right type of extrinsic evidence for establishing latent ambiguity under Pennsylvania law, while the latter is not." *Bohler–Uddeholm*, 247 F.3d at 94 (citing *Duquesne Light Co.*, 66 F.3d at 614). In other words, "a party offers the right type of extrinsic evidence for establishing latent ambiguity if the evidence can be used to support 'a reasonable alternative semantic reference' for specific terms contained in the contract." *Bohler–Uddeholm*, 247 F.3d at 94 (quoting *Mellon Bank N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1012 n.13 (3d Cir. 1980)).

To be considered reasonable, a proffered alternative meaning for a contractual hook must meet two requirements. First, "it must be supported by contractual evidence that goes beyond the party's claim that the contractual hook has a certain meaning." *Bohler–Uddeholm*, 247 F.3d at 96. Second, the proffered interpretation "cannot contradict the standard meaning of a term." *Id.*

### a. Evaluating Exclusion 7 Without Extrinsic Evidence

As the language of Exclusion 7 of the ERP is facially clear, determining if it contains latent ambiguity requires the Court to first interpret its language without the aid of extrinsic evidence. *Bohler–Uddeholm*, 247 F.3d at 94. Exclusion 7 of the ERP provides that: "[T]he coverage for Prior Acts provided by this endorsement shall not apply to: . . . . [a]ny claims resulting from an occurrence of which the Named Insured had actual or constructive notice prior to the commencement of coverage under this policy."

28

(Doc. 118, Ex. 33 at ¶ C(7).)  Under the ERP, a "claim" is "a written notice received by the Named Insured of an intention to hold the [it] responsible for any occurrence covered by this policy . . . includ[ing] the service of suit . . . against the Named Insured." (*Id.* at ¶ F(1)).  The TIG Policy defines an "occurrence" as "an accident . . . which results in . . . Property Damage neither expected nor intended from the standpoint of the Insured." (*Id.* at § I, ¶ A.)  The ERP defines a "named insured" as "the person(s) or organization(s) stated within the Declarations of this policy or any UNDERLYING INSURANCE." (*Id.* at ¶ F(2).)  The TIG Policy and the ERP commenced on July 1, 1997.  (*Id.* at 1.)

Grinnell, as a Tyco subsidiary, is a named insured under the TIG Policy and the ERP.  Grinnell knew of the Fire in May 2007, nearly two months before the TIG Policy began.  Because the Fire was an accident which resulted in property damage that Grinnell neither expected nor intended, it qualifies as an "occurrence."  As the Brooklyn Hospital claim arose out of property damage from the Fire, it is a "claim[ ] resulting from an occurrence."  A reading of Exclusion 7 without the aid of extrinsic evidence compels the conclusion that the ERP does not cover claims resulting from an occurrence which a named insured knew of before the TIG Policy began.  Under such a reading, which TIG proposes as correct (Doc. 164 at 14, 19–20), Grinnell's loss from the Brooklyn Hospital claim would not be covered by the ERP because Grinnell knew of the Fire before the TIG Policy began.

### b.  Evaluating Exclusion 7 With Extrinsic Evidence

The Court must also examine extrinsic evidence to determine whether a latent ambiguity exists in Exclusion 7 of the ERP.  *Bohler–Uddeholm*, 247 F.3d at 94.  "[T]his evidence must show that some specific term or terms in the contract are ambiguous; it cannot simply show that the parties intended something different that was not incorporated into the contract."  *Id.* at 93.  The extrinsic evidence is appropriate if it can "support 'a reasonable alternative semantic reference' for specific terms contained in the contract."  *Id.* at 94 (quoting *Mellon Bank N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1012 n.13 (3d Cir. 1980)).

Grinnell claims that Exclusion 7 as a whole, especially the term "occurrence," is latently ambiguous.  (Doc. 116 at 20; Doc. 167 at 8–9.)  Grinnell argues that extrinsic evidence supports a reasonable alternative interpretation of "occurrence" – "[an] occurrence reasonably likely to result in claims that would reach the TIG Policy's coverage layer."  (Doc. 167 at 8.)  Using that definition, Exclusion 7 would only exclude claims resulting from occurrences that, when the TIG Policy began, Grinnell knew or reasonably should have known were likely to trigger the TIG Policy.  (Doc. 116 at 20–21.)  Grinnell claims that its interpretation of Exclusion 7 and "occurrence" is reasonable because it is supported by contractual evidence, namely the wording of the AEIA Policy, and narrows rather than contradicts the common meaning of "occurrence."  (Doc. 167 at 12.)  Grinnell maintains that because its alternative interpretation of "occurrence," a latently ambiguous term, is supported by proper extrinsic evidence and therefore reasonable, the Court must adopt it as a matter of law.  (Doc. 116 at 20–21.)

To support its interpretation, Grinnell points to the testimony of individuals who negotiated the TIG Policy and documents that purportedly show the parties' intent that the ERP prevent a gap in coverage between the AEIA Policy and the TIG Policy by extending the period for reporting occurrences that took place during the period covered by the AEIA Policy.  (*Id.* at 21–22; Doc. 167 at 7–9.)  The AEIA Policy required Grinnell to report "as soon as practicable" known occurrences that were reasonably likely to result in claims that would implicate AEIA's coverage layer.  (Doc. 116 at 23.)  Grinnell claims that the ERP was meant to cover occurrences that happened during the lifetime of the AEIA Policy but whose likelihood of reaching AEIA's coverage layer was not known to Grinnell at that time (and therefore did not have to be reported to AEIA).  (Doc. 116 at 24; Doc. 167 at 12.)  In other words, Grinnell believes that the ERP was meant to stand in for the extended reporting period that Tyco could have bought  from AEIA had it not stopped writing new coverage in 1996.  (Doc. 116 at 7, 24.)

Grinnell concludes that its proffered interpretation of Exclusion 7 must control because it is reasonable and therefore latently ambiguous.  (*Doc. 116* at 25, 27.)  In

Grinnell's view, its extrinsic evidence concerns "the parties' objectively manifested 'linguistic reference' regarding the terms of the contract," not "merely about their expectations" and supports a reasonable alternative interpretation for "occurrence" and Exclusion 7. (*Id.* at 17.) Therefore, Grinnell argues that because it has established that Exclusion 7 is latently ambiguous through proper extrinsic evidence, its interpretation of the provision must be adopted as a matter of law. (Doc. 167 at 19.) Accordingly, it reasons that pursuant to its interpretation, its loss from the Brooklyn Hospital claim is not barred from coverage because it neither knew nor reasonably should have known on July 1, 1997 that the Fire was likely to result in claims that would reach TIG's excess coverage layer, given that the information available at that time indicated that the Fire caused nearly $8 million in damage, a figure far below TIG's layer of coverage. (Doc. 116 at 28–29.)

TIG argues that Exclusion 7 is not latently ambiguous and should be enforced as written because Grinnell's extrinsic evidence only addresses the parties' alleged expectations surrounding the ERP and does not reveal a latent ambiguity in a facially unambiguous term. (Doc. 164 at 15–16.) It also notes that Grinnell's extrinsic evidence does not establish the intent behind the ERP that Grinnell suggests. (*Id.* at 21–23.)

The Court agrees that Grinnell's latent ambiguity argument is merely an *ex post* attempt to rewrite Exclusion 7 to exclude claims resulting from an occurrence that Grinnell had actual or constructive notice of prior to the start of the TIG Policy and knew or reasonably should have known would trigger TIG's layer of coverage. The extrinsic evidence proffered by Grinnell shows that the ERP was a "claims-made buyout" and that individuals working for Tyco and its insurance broker, Marsh, believed that "the TIG policy is meant to afford the coverage that an extended reporting period under the [AEIA] policy otherwise would." (Doc. 118, Ex. 15 at 38:13–19; Doc. 118, Ex. 22 at 101:17–21, 166:4–12; Doc. 118, Ex. 24 at 79:15–21; Doc. 118, Ex. 28 at 3.) This evidence only demonstrates Grinnell's belief that the ERP was meant to extend the period for reporting occurrences that took place during the period covered by the AEIA

Policy and stand in for the extended reporting period that Tyco could have bought from AEIA.  It is not the right type of extrinsic evidence for establishing latent ambiguity, as it only addresses the parties' intent by showing that Grinnell intended something different that was not incorporated into the ERP.  The extrinsic evidence fails to show that some specific term or terms in the ERP are ambiguous and cannot support a reasonable alternative interpretation for Exclusion 7 or "occurrence."  Accordingly, Exclusion 7 of the ERP is not latently ambiguous and will be enforced as written.

### 3. Illusory

Grinnell argues that even if Exclusion 7 is not latently ambiguous, TIG's interpretation of it must be rejected because it renders the coverage provided by the ERP illusory, given that the ERP would not pay benefits under any reasonably expected set of circumstances.  (Doc. 116 at 30–31.)  Grinnell reasons that the only occurrences that would be covered under the ERP would be catastrophic losses that were entirely unknown to Grinnell when the TIG Policy began on July 1, 1997.  (*Id.* at 31.)

TIG counters that an insurance policy is not illusory merely because of a potentially wide exclusion.  (Doc. 164 at 31.)  TIG contends that the ERP is also not illusory because it provides coverage for some acts.  (*Id.* at 32.)  It notes that the ERP was written as a small piece of a large, complex insurance program for Tyco and its many subsidiaries and applied to unknown catastrophic occurrences at all of those businesses, not just Grinnell.  (*Id.* at 32, 35.)  TIG also argues that it is possible that catastrophic events at locations with Grinnell-installed fire protection systems could have happened between June 1, 1993 and July 1, 1997 that were not known to Grinnell until after July 1, 1997, and that claims arising from such occurrences would be covered under the ERP.  (*Id.* at 34.)

As noted by a Pennsylvania federal court:

Insurance coverage is considered "illusory" where the insured purchases no effective protection. *See* Lee R. Russ, 7 *Couch on Insurance* 3d, §

32

101:20 at 101–74 (West 1997).  An insurance policy is not illusory if it provides coverage for some acts; "it is not illusory simply because of a potentially wide exclusion."  *Bagley v. Monticello Ins. Co.,* 430 Mass. 454, 720 N.E.2d 813, 817 (Mass.1999).  "Coverage under an insurance policy is not illusory unless the policy would not pay benefits under any reasonably expected set of circumstances."  *Lexington Ins. Co. v. Am. Healthcare Providers,* 621 N.E.2d 332, 339 (Ind.App.Ct.1993).  Contracts are illusory when "one party exploits the other;" where the contracts are "hopelessly or deceptively one-sided."  *Truck Ins. Exch. v. Ashland Oil, Inc.,* 951 F.2d 787, 790 (7th Cir.1992).

*Titan Indem. Co. v. Cameron*, No. 01-5435, 2002 WL 1774059, at *18 (E.D. Pa. July 30, 2002), *aff'd*, 77 F. App'x 91 (3d Cir. 2003); *see also Ace Capital Ltd. v. Morgan Waldon Ins. Mgmt., LLC*, 832 F. Supp. 2d 554, 572 (W.D. Pa. 2011).  This Court has expressed its belief that the Supreme Court of Pennsylvania will apply the illusory-coverage rule, as it has shown a willingness to "refuse to enforce exclusions if the result is illusory coverage."  *St. Mary's Area Water Auth. v. St. Paul Fire & Marine Ins. Co.*, 464 F. Supp. 2d 397, 411 (M.D. Pa. 2006) (citing *401 Fourth Street, Inc. v. Investors Ins. Group*, 583 Pa. 455, 879 A.2d 166, 174 n.3 (2005)), *vacated on other grounds*, 472 F. Supp. 2d 630 (M.D. Pa. 2007).  Whether coverage is illusory must be determined under the specific facts of each case.  See *Heller v. Pa. League of Cities & Municipalities*, 32 A.3d 1213, 1223 (Pa. 2011).  The relevant inquiry is "whether a particular coverage provision is swallowed-up by an exclusion, not whether the policy as a whole provides some degree of coverage despite the existence of an exclusion."  *Great N. Ins. Co. v. Greenwich Ins. Co.*, No. 05-635, 2008 WL 2048354 (W.D. Pa. May 12, 2008).

Grinnell has not demonstrated that the ERP has been "swallowed up" by Exclusion 7 or that it would not pay benefits under any reasonably expected set of circumstances.  Just because the ERP, due to Exclusion 7, does not cover claims resulting from catastrophic occurrences that happened between June 1, 1993 and July 1, 1997 that Tyco or any of its subsidiaries knew about before July 1, 1997 does not preclude the possibility of claims resulting from catastrophic occurrences that happened

during that four year period but were not known of by Tyco or any subsidiary before July 1, 1997 that would be covered by the ERP.  Tyco and its subsidiaries are involved in a wide variety of business activities, including manufacturing and distributing disposable medical supplies; designing, manufacturing, and installing fire detection and sprinkler systems; and manufacturing and distributing flow control products and electrical and electronic components.  (Doc. 164 at 35.)  Knowing that, one can conceive of situations in which Tyco or a Tyco subsidiary faced claims resulting from an occurrence that happened between June 1, 1993 and July 1, 1997 but was unknown until after July 1, 1997, such as products liability claims resulting from faulty products made or distributed during that four-year period.  Such claims would not be excluded by Exclusion 7 of the ERP.  Therefore, Exclusion 7 does not render coverage under the ERP illusory.  Accordingly, Grinnell's Motion for Summary Judgment will be denied.

### D.  TIG's Motion for Summary Judgment on Exclusion 4 (Doc. 120)

TIG argues that summary judgment should be granted in its favor on the grounds that Exclusion 4 of the ERP bars coverage for the Brooklyn Hosptial claim because the AEIA policy provided coverage for the claim.  (Doc. 121 at 7.)  Exclusion 4 bars from coverage "[a]ny claims covered, in whole or in part, by the terms of any other policy of insurance available to the Named Insured, whether or not collectible."  (*Id.*)

TIG asserts that the Fire was an "occurrence" covered by the AEIA Policy, which required Grinnell to notify AEIA of occurrences that happened during the policy period (July 1, 1993 to July 1, 1997) no later than sixty days after the end of the policy period.  (*Id.* at 8.)  TIG contends that Grinnell failed to preserve its coverage for the Brooklyn Hospital claim under the AEIA Policy because it did not notify AEIA of the Fire until September 8, 1999, even though it knew of the Fire when it happened in May 1997.  (*Id.* at 9–10.)  To support this point, TIG cites AEIA's denials of coverage dated April 23, 2001, June 27, 2002, and July 10, 2007, which base their decision on Grinnell's failure to give notice of the Fire prior before the sixty day grace period for reporting ended on

August 30, 1997. (*Id.* at 10.) TIG reasons that because coverage for the Brooklyn Hospital claim was available under the AEIA Policy, Exclusion 4 bars coverage under the TIG Policy for that claim.

Grinnell maintains that TIG's argument fails for three reasons. (Doc. 160 at 6.) First, Exclusion 4 is an "escape clause" that is invalid under Pennsylvania law. (*Id.* at 7.) Next, even if Exclusion 4 was valid, it does not bar coverage for the Brooklyn Hospital claim because the AEIA Policy was not "available" to Grinnell when the claim was filed. (*Id.*) Finally, even if the AEIA Policy was "available" to Grinnell when the Brooklyn Hospital claim was filed, Exclusion 4 contains a latent ambiguity that must be interpreted in Grinnell's favor. (*Id.*)

### 1. Ambiguity

Grinnell's argument that Exclusion 4 contains a latent ambiguity that must be interpreted in its favor fails for the same reasons that its identical argument concerning Exclusion 7 fails. The extrinsic evidence proffered by Grinnel only demonstrates Grinnell's belief that the ERP was meant to extend the period for reporting occurrences that took place during the period covered by the AEIA Policy and stand in for the extended reporting period that Tyco could have bought from AEIA. (Doc. 118, Ex. 15 at 38:13–19; Doc. 118, Ex. 22 at 101:17–21, 166:4–12; Doc. 118, Ex. 24 at 79:15–21; Doc. 118, Ex. 28 at 3.) Such evidence is not the right type to establish latent ambiguity, as it only addresses the parties' intent by showing that Grinnell intended something different that was not incorporated into the ERP. It fails to show that some specific term or terms in the ERP are ambiguous and cannot support a reasonable alternative interpretation for Exclusion 4. Accordingly, Exclusion 4 of the ERP is not latently ambiguous and will be analyzed as written.

### 2. Escape Clause

Grinnell argues that Exclusion 4 is invalid because it is an escape clause. "'Other insurance' clauses purport to limit the insurer's liability when other insurance is applicable to the loss." *Harleysville Ins. Cos. v. Aetna Cas. & Sur. Ins. Co.*, 795 A.2d

383, 385 (Pa. 2002). "[T]here are three general types of 'other insurance' clauses – excess, pro rata and escape." *Contrans, Inc. v. Ryder Truck Rental, Inc.*, 836 F.2d 163, 166 (3d Cir. 1987). "An escape clause attempts to release the insurer from all liability to the insured if other coverage is available." *Id.* "Since escape clauses purport to relieve an insurer from any obligation to the insured if other coverage is available, courts view them with disfavor and will enforce the policies as if they did not exist." *Harstead v. Diamond State Ins. Co.*, 723 A.3d 179, 181 (Pa. 1999); *accord Auto Underwriters, Inc. v. Fireman's Fund Ins. Cos.*, 874 F.2d 188, 189 (3d Cir. 1989).

TIG responds that Exclusion 4 is not an escape clause, but rather precludes from the grant of coverage any claim covered by any other insurance policy. (Doc. 172 at 22.) It contends that "other or double insurance exists where there are two or more insurance policies covering the same interests, the same subject matter and against the same risk." *Blue Anchor Overall Co. v. Pa. Lumbermans Mut. Ins. Co.*, 123 A.2d 413, 415 (Pa. 1956). If there is double insurance, the courts use the "other insurance" clauses to harmonize multiple policies that provide coverage for the same loss. *See, e.g., Chester Carriers, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 767 A.2d 555 (Pa. Super. Ct. 2001); *Harleysville Ins. Cos.*, 795 A.2d 383 (Pa. 2002).

Here, the AEIA Policy and the TIG Policy's ERP insure against different risks. The AEIA Policy covered claims resulting from occurrences that happened during the policy period of July 1, 1993 to July 1, 1997 and that Grinnell gave notice of as soon as practicable, no later than sixty days after the end of the policy period. (Def.'s SMF at ¶¶ 15–17; Pl.'s SMF at ¶ 11.) Grinnell was required to report occurrences likely to involve the AEIA Policy, a "high excess level" policy which provided coverage of $90 million in excess of $60 million. (Def.'s SMF at ¶ 13.) The ERP provided coverage for claims resulting from occurrence that took place from June 1, 1993 to July 1, 1997 that, *inter alia*, TIG did not know of prior to July 1, 1997 (per Exclusion 7) or were not covered, in whole or in part, by any other insurance policy available to Grinnell, whether or not collectible (per Exclusion 4). (Pl.'s SMF at ¶¶ 19–21, 52, 69.) As the risks insured

against are different, the two policies do not provide multiple insurance coverage for the same loss.  Thus, Exclusion 4 is not an escape clause seeking to avoid liability and Grinnell cannot defeat TIG's motion for summary judgment with this argument.

### 3.  Availability of Coverage

Grinnell argues that even if Exclusion 4 is not an escape clause, it does not bar coverage for the Brooklyn Hospital claim because the AEIA Policy was not "available" to Grinnell when the claim was filed.  (Doc. 160 at 7.)  Grinnell contends that when coverage is provided on a "claims-made" basis, as it was in the ERP, the relevant time period for determining the applicability of an exclusion to a particular claim is the time that claim is made.  (*Id.* at 10.)

TIG counters that coverage for the Brooklyn Hospital claim was available to Grinnell under the AEIA Policy and that Grinnell's failure to timely report the Fire caused AEIA to deny coverage.  (Doc. 172 at 15–17; Doc. 121 at 7–10.)  TIG contends that Grinnell failed to preserve its coverage for the Brooklyn Hospital claim because it did not notify AEIA of the Fire until September 8, 1999, more than two years after the Fire occurred.  (*Id.* at 8–10.)  The AEIA Policy required Grinnell to notify AEIA of occurrences likely to involve the policy as soon as practicable during the policy period or the sixty day grace period afterward.  (Def.'s SMF at ¶¶ 15–16; Pl.'s SMF at ¶ 11.)  AEIA denied coverage on three separate occasions between 2001 and 2007, basing their decision on Grinnell's failure to give notice of the Fire prior to August 30, 1997, when the sixty day grace period for reporting ended.  (Doc. 121 at 10.)  TIG reasons that because coverage for the Brooklyn Hospital claim was available under the AEIA Policy between May 5, 1997 and August 30, 1997, Exclusion 4 bars coverage under the TIG Policy for that claim.  (Doc. 172 at 15–17; Doc. 121 at 7–10.)

Here, the Brooklyn Hospital claim was not covered by the terms of any other insurance policy available to Grinnell.  Under the AEIA Policy, Grinnell was required to notify AEIA of occurrences that happened during the policy period and were likely to involve the policy, which provided coverage of $90 million in excess of $60 million,

during the policy period or the sixty days immediately after. (Def.'s SMF at ¶¶ 13, 15–17.) The initial estimate of damage caused by the Fire, which Grinnell's outside counsel received in mid May 1997, conservatively valued the destruction of the warehouses and their contents at about $8 million. (*Id.* at ¶ 8.) Grinnell's loss in the Brooklyn Hospital claim would have been covered under the AEIA Policy had Grinnell known that the Fire was likely to result in losses exceeding $60 million and notified AEIA of it between May 5, 1997 (when the Fire started) and August 30, 1997 (when the reporting period for the AEIA Policy ended). However, as Grinnell did not notify AEIA of the Fire until September 8, 1999, it was not covered by the AEIA Policy. Therefore, because the Brooklyn Hospital claim was not "covered, in whole or in part, by the terms of any other policy of insurance available to [Grinnell], whether or not collectible," Exclusion 4 does not apply to the Brooklyn Hospital claim. Accordingly, TIG's Motion for Summary Judgment on Exclusion 4 will be denied.

### E. TIG's Motion for Summary Judgment on Exclusion 7 (Doc. 122)

TIG argues that it is entitled to summary judgment because no coverage is owed to Grinnell for its loss in the Brooklyn Hospital Claim pursuant to Exclusion 7 of the ERP precludes such coverage. Exclusion 7 expressly precludes from coverage "[a]ny claims that result from an occurrence of which [Grinnell] had actual or constructive notice prior to commencement of coverage under the policy." (Doc. 123 at 11.) TIG claims that this language is clear, unambiguous, and subject to only one reasonable interpretation: that Exclusion 7 bars coverage for claims arising out of occurrences of which Grinnell had notice of prior to July 1, 1997. (*Id.*) TIG reasons that because Grinnell knew of the Fire, which started on May 5, 1997, prior to the commencement of the TIG Policy on July 1, 1997, any claims resulting from that occurrence, including the Brooklyn Hospital Claim, are excluded from coverage under the TIG Policy and the ERP. (Doc. 123 at 11–16.)

As the Court has previously found that Exclusion 7 is unambiguous and not illusory, it will be enforced as written. Because Grinnell knew of the Fire before the TIG Policy began, its loss in the Brooklyn Hospital claim, which resulted from the Fire, will not

be covered by the ERP of the TIG Policy.  Accordingly, TIG's Motion for Summary Judgment on Exclusion 7 will be granted.

**CONCLUSION**

For the aforementioned reasons, TIG's Motion to Strike (Doc. 174) will be granted in part and denied in part, TIG's Motion for Partial Summary Judgment on Grinnell's Affirmative Defense Asserting Estoppel (Doc. 124) will be granted, Grinnell's Motion for Summary Judgment (Doc. 115) will be denied, TIG's Motion for Summary Judgment on Exclusion 4 (Doc. 120) will be denied, and TIG's Motion for Summary Judgment on Exclusion 7 (Doc. 122) will be granted.

An appropriate order follows.

January 23, 2013                                    /s/ A. Richard Caputo
Date                                                         A. Richard Caputo
                                                              United States District Judge